# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN BECK,<br>DANNY JACKSON,<br>LARRY MUCK,<br>JAMES HARMON, and<br>JIM BEAVERS<br><br>          Plaintiffs,<br><br>v.<br><br>OKLAHOMA GAS AND<br>ELECTRIC COMPANY,<br><br>          Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. CIV-14-770-M<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT OKLAHOMA GAS AND ELECTRIC
COMPANY'S MOTION AND BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOHN BECK**

Roberta B. Fields, OBA No. 10805
Kristin M. Simpsen, OBA No. 22302
MCAFEE & TAFT
A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
roberta.fields@mcafeetaft.com
kristin.simpsen@mcafeetaft.com

Brian M. Jorgensen
*(Admitted Pro Hac Vice)*
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone:   (214) 969-3741
Facsimile:   (214) 969-5100
bmjorgensen@jonesday.com

## <u>TABLE OF CONTENTS</u>

I.     Introduction ............................................................................................... 1

II.    Statement of Undisputed Facts .................................................................. 2

     A.    OGE's Ardmore District. ............................................................. 2

     B.    Plaintiff Beck's job duties as a Local Rep in the Ardmore District. ............ 3

     C.    OGE's On-Call policies and procedures. .................................... 4

     D.    Beck's activities while On-Call. .................................................. 6

     E.    Beck's time off. ........................................................................ 10

     F.    The number of Call-Outs Beck worked. .................................... 12

III.    Standard of Review ................................................................................. 15

IV.    Argument ................................................................................................ 16

     A.    Courts consider several factors in determining whether on-call time is compensable, but the frequency of calls is the "pivotal" factor. ............ 16

     B.    Beck received between 1.18 and 1.98 after-hours Call-Outs per week. ........................................................................................ 18

     C.    When Beck accepted the Local Rep job, he understood and agreed that he would not be paid for on-call waiting time. ................................... 22

     D.    The services Beck provided while working were not related to what he did while On-Call. ............................................................... 24

     E.    Beck's alleged thirty-minute "response time" was imminently reasonable. ............................................................................... 25

     F.    Beck could use his On-Call time predominantly for his own purposes. ................................................................................. 28

V.    Conclusion .............................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Andrews v. Town of Skiatook,*
    123 F.3d 1327 (10th Cir. 1997) .......................................................................... passim

*Ariens v. Olin Mathieson Chem. Corp.,*
    382 F.2d 192 (6th Cir. 1967) .................................................................................... 23

*Armitage v. City of Emporia,*
    982 F.2d 430 (10th Cir. 1992) ............................................................................. 17, 19

*Armour & Co. v. Wantock,*
    323 U.S. 126 (1944)................................................................................................... 16

*Arthur v. K.D. Emrick Well Servicing Co.,*
    209 F. Supp. 491 (E.D. Okla. 1962) ........................................................................ 16

*Bartholomew v. City of Burlington, Kan.,*
    5 F. Supp. 2d 1161 (D. Kan. 1998) .................................................................... 18, 26

*Berry v. Cty. of Sonoma,*
    30 F.3d 1174 (9th Cir. 1994) .............................................................................. 22, 24

*Birdwell v. City of Gadsden, Ala.,*
    970 F.2d 802 (11th Cir. 1992) .................................................................................. 22

*Bodie v. City of Columbia,*
    934 F.2d 561 (4th Cir. 1991) .................................................................................... 23

*Boehm v. Kansas City Power & Light Co.,*
    868 F.2d 1182 (10th Cir. 1989) ..................................................................... 17, 19, 22

*Braziel v. Tobosa Dev. Servs.,*
    166 F.3d 1061 (10th Cir. 1999) ................................................................................ 24

*Britt v. CP Kelco U.S., Inc.,*
    No. CIV-09-436-RAW, 2010 WL 4054383 (E.D. Okla. Oct. 15, 2010).............. 18, 25

*Burnison v. Mem'l Hosp., Inc.*,
 820 F. Supp. 549 (D. Kan. 1993) .............................................................. 18, 26, 27, 29

*Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*,
 No. CV 13-0971 JB/GBW, 2015 WL 8014565 (D.N.M. Oct. 20, 2015) ................... 18

*Dinges v. Sacred Heart St. Mary's Hosp., Inc.*,
 164 F.3d 1056 (7th Cir. 1999) .................................................................................. 25

*Gilligan v. City of Emporia, Kan.*,
 986 F.2d 410 (10th Cir. 1993) ............................................................................ 17, 19

*Hudler v. Okla. Gas & Elec. Co.*,
 No. CIV-01-0343-HE, slip op. (W.D. Okla. Feb. 1, 2002) ................................. passim

*Norton v. Worthen Van Serv., Inc.*,
 839 F.2d 653 (10th Cir.1988) ............................................................................ 19, 20

*Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*,
 971 F.2d 347 (9th Cir. 1992) ............................................................................. 22, 23

*Pabst v. Okla. Gas & Elec. Co.*,
 228 F.3d 1128 (10th Cir. 2000) .................................................................... 17, 19, 26

*Price v. Pub. Serv. Co. of Okla.*,
 No. 13-CV-514-GKF-FHM, 2016 WL 1558464 (N.D. Okla. Apr. 15,
 2016) ................................................................................................................. passim

*Renfro v. City of Emporia*,
 948 F.2d 1529 (10th Cir. 1991) ........................................................................ passim

*Rousseau v. Teledyne Movible Offshore, Inc.*,
 805 F.2d 1245 (5th Cir. 1986) .................................................................................. 23

*Sarmiento v. City and Cnty. of Denver*,
 82 F.3d 426 (10th Cir. 1996) .................................................................................... 19

*Skidmore v. Swift & Co.*,
 323 U.S. 134 (1944) ................................................................................... 16, 22, 24

*Somers v. Cudd Energy Servs., Inc.*,
 No. CIV-11-724-M, 2012 WL 1836269 (W.D. Okla. May 21, 2012) ....................... 15

*Taunton v. GenPak, LLC*,
 762 F. Supp. 2d 1338 (M..D. Ala. 2010) ..................................................... 23

*Townsend v. Mercy Hosp. of Pittsburgh*,
 862 F.2d 1009 (3rd Cir. 1988) ................................................................ 24

STATUTES AND REGULATIONS

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. ................................. passim

29 C.F.R. § 785.17 .................................................................................... 22

Fed. R. Civ. P. 56(a) ................................................................................ 15

I.      **Introduction**

Plaintiff John Beck ("Beck"), a former Local Representative for Oklahoma Gas &
Electric ("OGE"), claims that he is entitled to overtime compensation for every second of
every day that he was on-call, but not actively working, from July 21, 2011 through
December 1, 2013.  His claim for on-call pay fails as a matter of law.

*First,* while courts consider several factors in determining whether an employer
owes overtime compensation under the Fair Labor Standards Act ("FLSA") for time
employees spend on-call, the most "critical" factor is the frequency of calls.  That is,
courts carefully examine how often employees were called back to work while they were
on-call.  Here, there can be no genuine dispute that Beck received an average of only
between 1.11 and 1.98 calls back to work week, or "Call-Outs" per OGE parlance.  This
is simply insufficient as a matter of law to convert Beck's on-call time into compensable
work time.  Indeed, in cases with virtually identical circumstances, federal courts in this
circuit, including this Court, have granted summary judgment to employers because the
employee, like Beck, received call backs only infrequently.

*Second,* in addition to call frequency, courts consider factors such as the
agreement between the parties, the nature and extent of any restrictions placed on the
employee while on-call, the relationship between the services rendered and the waiting
time, and the required response time.  Courts also review the employee's ability to
engage in personal activities while on call.  All of these factors support finding that Beck
is not owed overtime compensation for time spent on-call.  The evidence conclusively
demonstrates that Beck was free to spend his on-call time doing what he wanted, as long

as he remained sober, lived within thirty minutes of his assigned zone, and responded to Call-Outs within a "reasonable" time, generally within thirty minutes. These reasonable rules, coupled with the diminutive number of calls he received, allowed Beck to engage in a wide array of personal pursuits while he was on-call.

This case falls in line with the large body of on-call cases, discussed thoroughly below, where the Tenth Circuit and lower courts in this circuit concluded that the on-call time at issue was not compensable. OGE is entitled to judgment as matter of law.

## II. <u>Statement of Undisputed Facts</u>

### A. OGE's Ardmore District.

1.    OGE is an electric-utility company authorized to provide reliable electric service to more than 800,000 commercial and residential customers in Oklahoma and western Arkansas. (Declaration of Kenneth McKinzie ¶ 5 ("McKinzie Decl."); attached as Ex. 1).) OGE divides its operations geographically into districts. (*Id.* Ex. 1-A.) Plaintiffs worked in the "Ardmore District." (*Id.* ¶ 6.)

2.    The Ardmore District is subdivided into "zones," which are named for the largest town in the area:  Ardmore, Durant, Healdton, Madill, Sulphur, Ada, and Paul's Valley. (*Id.* ¶ 5.)

3.    From November 27, 2006 until September 16, 2013, Kenny McKinzie worked as a Service Foreman in the Ardmore District. (*Id.* ¶ 2.) On September 16, 2013, his title changed to Field Supervisor—Service, but his duties did not change. (*Id.*) He held this role until October 2015, at which time he was promoted to District Supervisor for the Southern Area. (*Id.*)

2

4.      As Service Foreman and Field Supervisor—Service, McKinzie was Beck's direct supervisor.   (Transcript of Deposition of John Beck 38:3–39:19 ("Beck Dep."; attached as Ex. 2); McKinzie Decl. ¶ 3.)

**B.      Plaintiff Beck's job duties as a Local Rep in the Ardmore District.**

5.      Beck began working for OGE as a Lineman in Enid, Oklahoma on December 1, 1975.   (Beck Dep. 20:17–21:10.)   In or around 1994, Beck moved to Marietta, Oklahoma and accepted a position as the Local Representative ("Local Rep") for that area.   (*Id*. 25:25–26:10.)   He held that role for approximately twenty-eight years, until he retired on December 1, 2013.   (*Id*. 26:5–10, 27:3–23, 112: 2–7.)[1]

6.      As a Local Rep, Beck was responsible for installing, maintaining, and repairing electrical service and metering equipment in the Marietta zone.   (McKinzie Decl. ¶ 9.))   He was also responsible for operating and maintaining electrical distribution facilities and street light systems and representing OGE through civic engagement.   (Beck Dep. 28:5–29:10; McKinzie Decl. ¶ 9; Ex. 1-B.)

7.      Beck was a "first responder" for OGE.   (Beck Dep. 28:5–9.)   While working during his regularly scheduled shift and while On-Call, he was expected to be the first employee from OGE to respond to service restoration calls or power emergencies in his zone, such as downed power lines, electrical fires, or storms.   (*Id*. 28:5–29:10;

---

[1] On September 16, 2013, the Local Rep job title was changed to "Area Service Lineman."   (McKinzie Decl. ¶ 7.)   The duties and responsibilities of the position did not substantively change.   (*Id*.)   For the sake of clarity, OGE will refer to the position throughout this brief as "Local Rep."

McKinzie Decl. ¶ 10.)  Beck refers to emergency or service restoration work such as this as "trouble work," or working "trouble calls" or "trouble tickets."  (Beck Dep. 33:3–15, 41:6–10.)

### C.   OGE's On-Call policies and procedures.

8.      As a Local Rep, Beck worked a regular schedule Monday through Friday, from 7:00 am until 3:30 pm.  (Beck Dep. 51:5–15; McKinzie Decl. ¶ 12, Ex. 1-C, at 6.)

9.      Beck also spent time "On-Call."    (Beck Dep. 42:4–6, 51:16–52:22.) According to OGE's Overtime for Nonexempt Members Policy ("Overtime Policy"), Beck was "On-Call" when he had "notice . . . that he . . . will be called upon as a first responder for emergencies or service restorations occurring after the scheduled workday is complete."  (McKinzie Decl. ¶ 12, Ex. 1-C, at 6.)

10.     When Beck accepted the Local Rep position in or around 1994, he knew and understood that "[he would] be on-call 24-7, 365 days a year."  (Beck Dep. 41:23–42:6.)  In his Second Amended Complaint, he claims that he was always On-Call after his regular working hours, which he alleges resulted in him "being required to work twenty-four hours a day, seven days a week, three hundred sixty-five days a year."  (Plaintiffs' Second Amended Complaint ("SAC") ¶ 26.)  In his deposition, however, he admitted that there were times when he was not On-Call, such as when he was sick, on vacation, or when he found another OGE employee to cover trouble calls in his zone.  (*See* Beck Dep. 131:12–133:23, 134:14–25, 138:15–23, 140:23–141:5; *see also* McKinzie Decl. ¶¶ 13–16, 27–29.)

11.     OGE's Overtime Policy defines a "Call-Out" as "being summoned to a

worksite after [a] member has left the worksite and prior to the next regularly scheduled workday." (McKinzie Decl. at ¶ 17, Ex. 1-C, at 5.)  Beck was "summoned" to worksites after hours when he was On-Call and a customer in the Marietta zone called OGE's interactive voice response system ("IVR system") or the customer service department with a trouble ticket. (Beck Dep. 32:20–23; McKinzie Decl. ¶ 18.)  Customer service or the IVR system would then provide the information about the trouble ticket to the Dispatch Control Center ("DCC"), and DCC would contact Beck on his OGE-issued cell phone.  (*Id*.;  Beck  Dep.  32:15–33:15,  61:2–62:16,  104:24–105:14,  105:20–107:18, 133:24–134:6, 175:24–176:4, 181:21–182:10.)  If Beck accepted the trouble ticket, DCC would send him the ticket number associated with the call, location, and nature of the problem to his computer, called a Mobile Data Unit ("MDU").  (Beck Dep. 31:7–25, 62:17–63:2; 134:7–13; McKinzie Decl. ¶ 20.)

12.    After receiving a Call-Out, Beck would travel to the location and assess the situation.  (Beck Dep. 62:17–63:2; *see also* McKinzie Decl. ¶¶ 20–21.)  Upon arrival, he would either perform the work necessary to fix the problem, or inform DCC that follow-up work was necessary.  (Beck Dep. 31:7–33:17; 39:20–41:22, 62:17–63:2; McKinzie Decl. ¶¶ 10, 21.)

13.    Beck used his MDU to update the status of his work on Call-Outs, (as well as for work performed during regularly scheduled work hours).  (*See generally* Beck Dep. 31:7–33:17, 35:11–37:9 39:20–41:22; McKinzie Decl. ¶¶ 20–21.)  The MDU is a mobile computer that can be used as a laptop anywhere, including in OGE trucks, outdoors, or at home.  (Beck Dep. 31:7-34:14.)  Once DCC sent a ticket to Beck's MDU,

whether during his regular shift or after hours, he used the MDU to update the status of his work on the ticket.  (Beck Dep. 32:15–33:17, 35:11–25; McKinzie Decl. ¶ 20.)  He updated the status of his work on that ticket by clicking a button on the MDU interface labeled "next status."  (McKinzie Decl. ¶ 20.)  When Beck clicked the button, he moved the ticket through the following statuses:  "accept," "en route," "arrived," "reporting," and either "clear follow-up," or "dispose."  (*Id*.; Beck Dep. 35:11–25, 40:14–41:3.)

14.    The "accept" status indicated that Beck accepted the ticket from DCC. (Beck Dep. 40:14–41:3, 64:18–25.)  When Beck arrived at the location of the trouble call, he clicked a button on the MDU labeled "arrived."  (Beck Dep. 36:23–37:11, 39:20–25, 40:9–11.)  After assessing the problem and completing his work, he clicked the button labeled "reporting" and wrote a short description of the work he performed on the MDU. (Beck Dep. 39:20–40:13, 77:25–78:10, 82:2–15, 87:3–7.)  After finishing the description, he advanced the ticket to one of two statuses:  "clear follow-up," which indicated that a line crew or other group was needed to do additional work, or "dispose," which indicated that the work was finished and the ticket was complete.  (Beck Dep. 36:23–37:6, 40:4–41:22.)  The MDU system recorded a time stamp every time Beck changed the status of a ticket.  (Beck Dep. 36:1–22, 40:1–3; *see also* McKinzie Decl. ¶ 22.)

   **D.    Beck's activities while On-Call.**

15.    While On-Call and waiting for a Call-Out, OGE expected Beck to:

- Remain sober and fit to report to work while On-Call, and to don appropriate safety clothing before responding to a Call-Out.  (Beck Dep. 62:20–22, 135:21–136:3; McKinzie Decl. ¶ 30.);
- Live within thirty minutes of his assigned zone.  (McKinzie Decl. ¶ 31.);

6

- Respond to Call-Outs within a "reasonable" time. (Beck Dep. 129:9–25; *see also* Transcript of Deposition of Larry Muck, 84:16–23, 110:17–111:4 ("Muck Dep.," attached as Ex. 3); McKinzie Decl. ¶ 31, Ex. 1-C, at 13.)
- Be in his OGE truck and driving to the location of a trouble call he accepts within a "reasonable" time, which he viewed as within thirty minutes of receiving the call. (Beck Dep. 64:15–20, 65:9–16; McKinzie Decl. Ex. 1-C, at 13.)[2]

16.     These rules allowed Beck a significant amount of freedom.  During the relevant time, Beck did, in fact, engage in personal activities while On-Call.  (Beck Dep. 116:18-122:6, 123:25–124:18, 125:7-129:8, 131:4–11.)  Beck testified, for example, that he did yard work and cared for his home; visited with his children and grandchildren, who generally came to visit him, but who he traveled to see occasionally; traveled to Ardmore to visit his son; ate dinner at restaurants with his family; attended his granddaughter's tee-ball games in Marietta; watched television; worked on his personal vehicles; went camping, sometimes with Plaintiff Danny Jackson, at area lakes; and slept. (*Id*.)  Additionally, during the relevant time, Beck used seventy-five vacation days, traveled out of state to visit his son, and traveled out of the country on at least one occasion with three other Plaintiffs in this matter.  (*Id*. 148:16–150:12.)[3]

17.     OGE provided Beck with a cell phone and a truck.  (Beck Dep. 47:9–16,

---

[2] Beck understood that to "respond" to a Call-Out, he had to "accept" the trouble ticket on his MDU.  (Beck Dep. 64:15–65:8.)  It could, and sometimes did, take Beck longer than thirty minutes to arrive at the location of a trouble call.  (*Id*. 65:5–8.)

[3] In either January of 2012 or 2013, Beck, Danny Jackson, Jim Beavers, Larry Muck, and their wives took a week-long cruise to the Caribbean together.  (Beck Dep. 155:1–156:25.)

61:19–62:1.)  He used the cell phone and truck for both work and personal purposes. (Beck Dep. 121:21–122:25, 128:6–21, 181:21–182:10.)  OGE permitted Beck to take his OGE truck anywhere he wanted after working hours and while On-Call, as long as he stayed within 30 minutes of his zone.  (Beck Dep. 120:24–122:6, 129:9–24.)

18.    McKinzie never placed Beck on a performance improvement plan, issued him a formal warning, suspended him, docked his pay, or formally disciplined him in any manner for failing to respond to a call within thirty minutes, or otherwise adhere to OGE's rules.  (Beck Dep. 68:8–71:21; *see also* McKinzie Decl. 35.)  Beck even received favorable performance evaluations in 2011 and 2012,[4] even though he thinks his response times were judged in categories like "customer satisfaction" and "timeliness."  (Beck Dep. 68:1–7, 141:23-147:17; McKinzie Decl. ¶ 35.)

19.    Beck claims that response times were measured using a metric called "CAIDI/SAIDI time," which he "believes" measures the difference in the time between when a customer calls complaining about his or her lights being off, and when the power is restored.   (Beck Dep. 66:1–67:2.)   Beck further claims that he was told his "CAIDI/SAIDI time" was expected to be one hour and ten minutes; these times comprised a part of his annual bonus, called a TeamShare Bonus.; and that McKinzie "evaluated" his job performance based on his "CAIDI/SAIDI times." (Beck Dep. 66:1–67:25.)

---

[4] Beck did not receive a substantive evaluation in 2013 because he retired.  (Beck Dep. 147:6-17.)

20.     Beck admits, though, that he was never subjected to a formal disciplinary action, docked pay, or punished in any way for failing to meet this requirement.  (Beck Dep. 68:8–71:21.)    And even when Beck did not meet what he believed the "CAIDI/SAIDI time" expectation to be, he says that he merely had a discussion with his supervisor about why it took him long to complete the call.  (*Id*.)

21.     Beck testified that McKinzie is the correct person to explain what CAIDI and SAIDI means.  (Beck Dep. 75:16–20.)  According to McKinzie, CAIDI and SAIDI are metrics that track the average number of minutes OGE's customers are without power during an electrical-service interruption or power outage.  (McKinzie Decl. ¶¶ 32–34.) CAIDI and SAIDI times are measured company-wide and by the Company's "historical districts": Ardmore, Durant, Healdton, Madill, and Sulphur.  (*Id*. ¶ 32 )  OGE does not, and has never used CAIDI and SAIDI times to track individual Local Rep's service-restoration times.  (*Id*. ¶¶ 32–33.)  Rather, CAIDI and SAIDI times represent the average service-restoration time for every power outage or service interruption reported by every customer, both during and after hours, in a particular zone.  (*Id*.)  In other words, it averages the service-restoration time for all calls that all Local Reps or other employees, such as Lineman, handled in the entire District over a given time.  (*Id*.)  There is no CAIDI or SAIDI metric tied only to Beck.  (*Id*.)

22.     Beck testified that his CAIDI and SAIDI times affected his evaluations and TeamShare bonus.  (Beck Dep. 67:3–10.)  He also testified that response times were measured, if at all, on his evaluations as one factor among several in categories like "customer satisfaction" and "timeliness," and that he simply did not know how

9

TeamShare was calculated.  (*Id.* 68:1–7, 72:8–74:17, 142:24–143:19, 144:22–147:11.)  In fact, for non-exempt employees like Beck, TeamShare was calculated by measuring company-wide performance in four weighted categories: earnings per share, O&M, safety, and customer satisfaction.  (Declaration of Scharon K. Cantrell ¶ 4 ("Cantrell Decl."; attached as Ex. 4).)  The customer satisfaction category comprised 35% of the total score and was made of three equally weighted subcategories: customer surveys, customer complaints, and SAIDI.  (*Id.* ¶ 5).  SAIDI is defined as the sum of all electrical-service-interruption durations, divided by the total number of customers served in a twelve-month period.  (*Id.* ¶ 6).  CAIDI was not a metric considered by OGE in calculating TeamShare bonuses.  (*Id.* ¶ 7).  SAIDI time comprised only 11.67% of Beck's potential bonus, and, as described above, SAIDI was a twelve-month average of all service-restoration times for all employees in the entire Company.

### E.     Beck's time off.

23.     If Beck needed not to be On-Call for some reason on a particular night or weekend, he could find another Local Rep, Lineman, or other qualified employee to be his "backup" and cover trouble calls in his territory.  (Beck Dep. 133:2–23; *see also* McKinzie Decl. ¶ 13–16.)  Beck had several backup options, including the individual On-Call at the Ardmore Service Center, another Local Rep, the "roaming rep," another Lineman, and his supervisor Kenny McKinzie.  (Beck Dep. 131:12–132:16; McKinzie Decl. ¶ 13–14.)  Beck did not have to use his paid sick or vacation days if he found his own backup.  (Beck Dep. 133:17–23.)  When Beck had someone backing him up and he received an after-hours call from DCC, he could tell the DCC operator to contact his

backup.  (*See* Beck Dep. 138:19–139:1; McKinzie Decl. ¶ 13.)

24.     The "roaming rep" was one of the Local Reps in the Ardmore District who acted as a backup to all the other Local Reps in the District for one week at a time on a rotating basis.  (Beck Dep. 136:20–137:19, 140:3–7, 179:18–180:14; *see also* McKinzie Decl. ¶ 16.)  The system was designed to give Local Reps an additional backup option in case they needed not to be On-Call for some reason.  (Beck Dep. 131:12–132:16, 139:12–20.)  The person acting as roaming rep was still responsible for trouble calls in his zone, but could backup any other Local Rep in the Ardmore District if necessary. (Beck Dep. 138:19–139:1.)

25.     Beck could also use his vacation days to engage in personal activities or if he needed not to be On-Call for some reason.  (Beck Dep. 133:2–5.)  Beck had five weeks of paid vacation each year and was permitted to carry over two weeks of unused vacation from year to year, meaning he could have up to seven weeks of vacation in his bank.  (*Id*. 133:6–9.)  He typically used five weeks of this time and carried two weeks over to the next year.  (*Id*. 151:8–23.)  Beck cannot recall an instance where he was not able to take vacation because no one was available to cover his territory.  (*Id*. 135:1–20; McKinzie Decl. ¶ 27.)

26.     Additionally, OGE pays Local Reps for eleven holidays each year, including two floating days and one for their birthday.  (Muck Dep. 99:12–23; McKinzie Decl., ¶ 28.)  Local Reps remain On-Call on holidays, but they are not expected to do any work unless they are Called-Out.  (*Id*.)  If Called-Out on a holiday, Local Reps were paid two and a half times their hourly wage.  (Beck Dep. 51:16-52:22; *see also* McKinzie

Decl. ¶ 9, Ex. 1-C, at 8–10; Muck Dep. 99:7-11.)

27.     OGE also gives ten paid sick days to Local Reps each, which accumulate from year to year if not used.  (McKinzie Decl. ¶ 29.)  By 2013, Beck had accumulated approximately six months of paid sick days.  (Beck Dep., 133:12–16, 185:16–186:12.) He used this time for twenty-four consecutive weeks in 2013—from June 13 until he retired on December 1.  (*Id*.; *see also* McKinzie Decl. ¶ 46.)

**F.     The number of Call-Outs Beck worked.**

28.     Local Reps are nonexempt employees paid on an hourly basis.  (McKinzie Decl. ¶ 10.)

29.     Beck was not paid for time he spent waiting while On-Call; rather, during his time On-Call, he was only paid for the time he spent responding to Call-Outs.  (Beck Dep. 42:7–43:21; McKinzie Decl. ¶ 37, Ex. 1-C, at 13.)

30.     For Call-Outs, OGE's Overtime Policy explains that Local Reps "shall be paid a minimum of two hours recorded time at the appropriate Daily Overtime rate when called from home to the worksite for emergency repair work."  (Beck Dep. 157:15– 158:12; *see also* McKinzie Decl. ¶ 38, Ex. 1-C, at 8.)

31.     Beck personally recorded every Call-Out he worked on his daily individual timesheets ("timesheets") and faxed them to OGE's payroll clerk daily.  (Beck Dep. 53:2–57:12, 58:6–59:25, 79:8–10, 100:15–101:10, 104:11–17, 141:6–9.)   He reported Call-Outs on his time sheets by recording that he worked at least two hours at a wage-rate code of either 9150, 9200, or 9250.  (*Id*. 47:23–25, 56:5–9, 58:25–59:8, 59:21–60:4.)

32.     Beck admitted at his deposition that he does not know and has not tried to

determine how many Call-Outs he actually received during the time relevant to this matter. (Beck Dep. 163:7–9, 133:12–16, 185:16–186:12.) He further admitted that he did not receive twelve to fifteen Call-Outs per week—as he alleged in the Second Amended Complaint—but guessed that "maybe" he received eight calls on average each week. (Beck Dep. 162:17–163:17.) Finally, he stated that the actual number of Call-Outs he received during the relevant time could be determined by comparing his timesheets and the data from his MDU. (Beck Dep. 58:6–59:25; 163:21–164:2.)

33.     From July 21, 2011 through December 1, 2013, Beck's timesheets show 186 instances where Beck recorded at least two hours of overtime, using a 9150, 9200, or 9250 wage-rate code. (McKinzie Decl. ¶ 44, Ex. 1-L.) Beck was actively employed for 94 weeks during this time. (*Id*. ¶ 46.) Thus, according to Beck's timesheets, the maximum number of Call-Outs per week on average that Beck could have possibly worked during this time was 1.98. (*Id*. ¶ 46.)

34.     Beck testified that his MDU recorded a timestamp every time he updated the status of his work on a ticket, and he testified that the number of Call-Outs he received could be determined by comparing the MDU and his timesheets. (Beck Dep. 35:11–36:3, 39:20–40:3, 58:6–60:4; McKinzie Decl. ¶ 22, Ex. 1-E.) According to the MDU data, Beck worked an average of 1.18 Call-Outs per week from July 21, 2011 through December 1, 2013. (*Id*. ¶ 46.)

35.     Beck checked his paycheck against his personal notes each pay period and determined that he was paid correctly for all his overtime hours. (*Id*. 57:1–12, 54:11–16, 82:19–23.)

36.    OGE distinguishes between an after-hours Call-Out and work that begins during the regular shift and extends beyond the end of it because the Local Rep is already working when the call is received and does not have to leave his home in response. (Beck Dep. 83:7–85:20.)  Specifically, OGE's Overtime Policy explains: "This minimum 'Call-Out' time does not apply . . . for work extending beyond the scheduled workday/shift."  (Beck Dep. 158:13–22; *see also* McKinzie Decl. ¶ 39, Ex. 1-C, at 11.) For instance, if Beck received notice of a trouble ticket at 3:00 pm—before the end of his regular shift—and it took him until 4:30 pm to complete the job and arrive at his home, he would be "working over" his shift, not being "Called-Out" from home.  (Beck Dep. 83:7–85:20.)  This situation is sometimes referred to as a "work-over" or "hold-over." (*Id.*)  This was not a Call-Out, as Beck was not called to work while On-Call.  (*Id.*)  Thus, when working-over like this, Beck was paid for the time he actually worked; the two-hour minimum did not apply.  (*Id.***)**

37.    At times, Beck worked more than one trouble ticket during the same Call-Out.  (Beck Dep. 98:8–100:17.)  This could occur if, for instance, multiple trouble calls came in from the same location at or around the same time, or if a Local Rep was already out working an after-hours Call-Out and he received an additional trouble call before completing the first.  (Beck Dep. 100:5–17, 102:1–11.)  In this scenario, Beck was paid for the actual time spent working on the tickets combined, if greater than two hours, or two hours if the work for all the tickets combined took two hours or less.  (Beck Dep. 60:22–25.)

38.    Beck testified that he was paid for every hour he worked, including for all

14

overtime hours he reported and at least two hours of overtime for every after-hours Call-Out he received.  (Beck Dep. 49:6–7; 54:11–16; 57:1–8; 82:19–83:6.)

## III.   Standard of Review

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *See also Price v. Pub. Serv. Co. of Okla.,* No. 13-CV-514-GKF-FHM, 2016 WL 1558464, at *1 (N.D. Okla. Apr. 15, 2016) (granting summary judgment to a utility employer on FLSA on-call claims); *Somers v. Cudd Energy Servs., Inc*., No. CIV-11-724-M, 2012 WL 1836269, at *3 (W.D. Okla. May 21, 2012) (granting summary judgment to employer on FLSA on-call claims).  In the context of a claim for on-call compensation under the FLSA, the Court must determine whether all the undisputed facts in the record taken together constitute compensable "work" as a matter of law.  *Hudler v. Okla. Gas & Elec. Co*., No. CIV-01-0343-HE, slip op. at 2 (W.D. Okla. Feb. 1, 2002) (citing and distinguishing *Pabst v. Okla. Gas & Elec. Co.,* 228 F.3d 1128, 132 (10th Cir. 2000)) (submitted herewith as Exhibit 5).

In making this determination, the Court must examine the record and draw any reasonable inferences therefrom in the light most favorable to the non-moving party. *Somers*, 2012 WL 1836269, at *3.  However, only disputes over facts affecting the outcome of the suit under the governing law are material, and the non-movant must do more than create some metaphysical doubt about the material facts.  *Id*. at *4.  *See also Renfro v. City of Emporia*, 948 F.2d 1529, 1533–34 (10th Cir. 1991) ("[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . .

must set forth specific facts showing that there is a genuine issue for trial.") (internal citations omitted).   In essence, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *Price*, 2016 WL 1558464, at *1 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252 (1986)).

## IV.   <u>Argument</u>

### A.   **Courts consider several factors in determining whether on-call time is compensable, but the frequency of calls is the "pivotal" factor.**

The FLSA requires an employer to pay an employee for time spent on-call, but not actually working, "only in certain circumstances."   *Price*, 2016 WL 1558464, at *1. "Courts frame the ultimate question as whether the employee is 'engaged to wait' or 'waiting to be engaged[.]'"   *Id.* (citing *Pabst*, 228 F.3d at 1132); *accord Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944); *Arthur v. K.D. Emrick Well Servicing Co.*, 209 F. Supp. 491, 493–94 (E.D. Okla. 1962) (framing the relevant distinction as between "working" and "being available for work"). In making this determination, courts consider several factors, including any agreement between the parties, the nature and extent of any restrictions placed on the employee while on call, the relationship between the services rendered and the waiting time, the number of calls received, and the required response time.   *Price*, 2016 WL 1558464, at *2 (citing *Pabst*, 228 F.3d at 1132 (citing *Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir. 1989) (citing *Skidmore*, 323 U.S. at 137))).   Courts also review the employee's ability to engage in personal activities while on call.   *Id.* (citing

16

*Armitage v. City of Emporia*, 982 F.2d 430, 432 (10th Cir. 1992); *Renfro*, 948 F.2d at 1537–38).

Courts in the Tenth Circuit have repeatedly observed that the "critical distinction between cases in which on-call time was found to be compensable and those in which it was not is the frequency of the calls." *Price*, 2016 WL 1558464, at *2 (citing *Pabst*, 228 F.3d at 1134); *see also Gilligan v. City of Emporia, Kan.*, 986 F.2d 410, 412 (10th Cir. 1993) (noting that the "frequency of the call backs . . . was the pivotal factor" in deciding that the employees' on-call time was compensable). When assessing the frequency of calls, "the proper question is which [prior] case is most analogous." *Pabst*, 228 F.3d at 1134. In cases in which courts have held that on-call time was compensable, the employee was usually called out multiple times in an average twenty-four-hour period. *See, e.g., Renfro*, 948 F.2d at 1537 (employees called out three to five times in a twenty-four-hour period and had to respond within fifteen minutes); *Pabst*, 228 F.3d at 1131 (employees called out three to five times per night and were required to check their computers every fifteen minutes to see if they had received a call). In contrast, in cases in which the employee was called out only a few times per week on average, courts have held the on-call time was not compensable. *See, e.g., Boehm*, 868 F.2d at 1183 (power company linemen called out no more than once per day and required to accept approximately one third of calls received); *Armitage,* 982 F.2d at 432 (police detectives "called in on average less than two times per week"); *Andrews v. Town of Skiatook*, 123 F.3d 1327, 1330 (10th Cir. 1997) (EMT called out on 16.18 to 22.96% of on-call shifts); *Price*, 2016 WL 1558464, at *2 (general servicers, crew members, and warehousemen for

PSO called out on average between 2.25 and 2.5 days per week when they were on call); *Hudler,* No. Civ. 01-343, at 8 (Local Reps for OGE called out "on average, two or three times per week").

**B.      Beck received between 1.18 and 1.98 after-hours Call-Outs per week.**

In this case, Beck received a small number of Call-Outs per week, on average, making this case "most analogous" to those in which courts found the on-call time non-compensable.  *See e.g.*, *See e.g.*, *Price*, 2016 WL 1558464, at *2 (granting summary judgment to employer where plaintiffs, power company linemen, received "an average of between 2.25 and 2.5 calls a week."); *Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, No. CV 13-0971 JB/GBW, 2015 WL 8014565, at *19 (D.N.M. Oct. 20, 2015) (granting summary judgment to employer where named plaintiff for a class of police sergeants and detectives could recall receiving calls only five or ten times over a period of several years); *Britt v. CP Kelco U.S., Inc.*, No. CIV-09-436-RAW, 2010 WL 4054383, at *7 (E.D. Okla. Oct. 15, 2010) (granting employer's and denying plaintiffs' motions for summary judgment where "highest number of pages any of the Plaintiffs received in one year was twelve."); *Hudler*, No. CIV-01-0343-HE, at 8 (granting summary judgment to OGE where plaintiff, a Local Rep, received an average of only 2 to 3 calls per week); *Bartholomew v. City of Burlington, Kan.*, 5 F. Supp. 2d 1161, 1167 (D. Kan. 1998) (granting summary judgment to employer where the plaintiffs were called less than once a week); *Burnison v. Mem'l Hosp., Inc.*, 820 F. Supp. 549, 554 (D. Kan. 1993) (granting employer's partial motion for summary judgment, finding on-call time not compensable where plaintiffs could expect to be called 1.1 to 1.4 per 24 hour period of on-call time).

18

In fact, the Tenth Circuit itself has directly examined the compensability of on-call waiting time on eight separate occasions and concluded only twice—in circumstances where the plaintiffs received as many as 25 calls per week—that the employees were owed compensation. *Compare Pabst*, 228 F.3d 1128 at 1134 (finding waiting time during on-call periods compensable where building-maintenance technicians received 3 to 5 calls every night), and *Renfro*, 948 F.2d at 1537 (holding firefighters were owed compensation for waiting during on-call time where plaintiffs received 3 to 5 calls every night), *with Andrews*, 123 F.3d at 1330 (affirming judgment denying compensation for on-call time to EMT who was called out on 16.18 to 22.96% of on-call shifts); *Sarmiento v. City and Cnty. of Denver*, 82 F.3d 426 (10th Cir. 1996) (unpublished) (submitted herewith as Exhibit 6) (affirming unanimously the district court order granting summary judgment to employer where plaintiff received calls approximately once per night); *Gilligan*, 986 F.2d at 411–13 (affirming summary judgment in employer's favor because plaintiffs were called back less than once a day); *Armitage*, 982 F.2d at 432 (reversing district court's order, determining that on-call compensation was not owed to police detectives who were "called in on average less than two times per week"); *Boehm*, 868 F.2d at 1183 (affirming directed verdict for employer where plaintiffs, power company linemen, were called out no more than once a day); *Norton v. Worthen Van Serv., Inc.*, 839 F.2d at 654–56 (affirming district court's judgment that plaintiffs were not owed compensation for on-call time where they were on-call for eight to twelve hours per day and had to respond to calls within fifteen minutes to twenty minutes).

The *Hudler* case is squarely on point. *See* No. CIV-01-0343-HE, at 7. Beck and

the plaintiff in *Hudler* worked the same job (Local Rep) for the same company under substantively identical conditions. *Id.* Like Beck, the plaintiff in Hudler sued OGE seeking compensation for time he spent waiting while On-Call. *Id.* After examining the evidence presented in *Hudler*—which showed that the plaintiff received an average of two to three Call-Outs per week, and was required to respond to them within fifteen minutes—this Court concluded, "The undisputed facts establish that plaintiff's on-call time, though substantially continuous and subject to periodic interruptions for call-backs, was spent predominantly for his own benefit rather than for the benefit of [OGE]." *Id.* at 10.

Here, the undisputed facts lead to the same conclusion. Beck testified that he recorded on his timesheets every single Call-Out he worked from July 21, 2011 until his retirement on December 1, 2013. (Stmt. of Fact ¶ 31.) He admits that he was paid overtime compensation for every Call-Out worked. (Stmt. of Fact ¶¶ 35, 38.) He also admits that he recorded a minimum of two hours of overtime for every Call-Out, pursuant to OGE's two-hour minimum policy. (Stmt. of Fact ¶¶ 30–31, 37.) Accordingly, every Call-Out he worked would be reflected on his timesheet with the appropriate wage-rate code, either "9150", "9200," or "9250," for at least two hours. (*Id.*; McKinzie Decl. ¶¶ 40, 42.) From July 21, 2011 through December 1, 2013, Beck's timesheets show 186 instances where Beck recorded at least two hours of overtime. (Stmt. of Fact ¶ 33; McKinzie Decl. ¶ 43.) Beck was actively employed for 94 weeks during the relevant time. (Stmt. of Fact ¶ 33; McKinzie Decl. ¶ 45.) Thus, according to Beck's undisputed testimony and timesheets, the maximum average number of Call-Outs per week that Beck

could have possibly worked was 1.98. (*Id*.)

Not every single instance where he worked two or more hours of overtime is a Call-Out; it could be a work-over, work on a storm, or simply a long day. (McKinzie Decl. ¶ 42.) Beck testified that his MDU recorded a timestamp every time he updated the status of his work on a ticket, and he testified that the number of Call-Outs he received could be determined by comparing the MDU and his timesheets. (Stmt. of Fact ¶ 34.) Harmonizing the MDU data and the timesheets reveals that he only worked an average of 1.18 Call-Outs per week during the relevant time. (*Id*.; McKinzie Decl. ¶45.)

Even if the MDU data is not considered at all, however, Beck's timesheets alone show that he received, at most, only 1.98 Call-Outs on average per week—fewer than the plaintiffs in both *Hudler* and *Price*. (Stmt. of Fact ¶ 34.) The highest number he received in a week was five, and he often went several weeks or entire months without a single Call-Out. (McKinzie Decl. ¶ 43, Ex. 1-Q.) In February 2012, for example, Beck did not receive an after-hours Call-Out at all; in February 2013, he received only one; and in April and May of 2013, he went forty-six consecutive days without being Called-Out after hours. (*Id*.)

In his Complaint, Beck nevertheless claims that he received 12 to 15 after-hours Call-Outs per week. (*See* SAC ¶ 28.) He admits, however, that the number of after-hours Call-Outs alleged in the Complaint did not apply to him, and that he does not know—and has not attempted to determine—precisely how many Call-Outs he actually received during the relevant time frame. (Stmt. of Fact ¶ 32.) Based on his memory alone, he estimates that he worked approximately eight Call-Outs per week on average. (*Id*.) But

as discussed above, the actual data, confirmed by his own sworn testimony, belies this claim. (Stmt. of Fact ¶ 31, 33–35; McKinzie Decl. ¶ 43–45.) Beck's off-the-cuff estimate, thus, amounts to mere speculation and cannot create a fact issue at summary judgment. *See e.g.*, *Renfro*, 948 F.2d at 1533–34.

> **C.   When Beck accepted the Local Rep job, he understood and agreed that he would not be paid for on-call waiting time.**

"[A]greements between the parties are one of the predominant factors to be considered in determining whether the employees' on-call waiting time is compensable." *Berry v. Cty. of Sonoma,* 30 F.3d 1174, 1180 (9th Cir. 1994); *see also Skidmore*, 323 U.S. at 137 (whether waiting time is time worked under the FLSA is determined by, among other things, "scrutiny and construction of the agreements between the particular parties" and "appraisal of their practical construction of the working agreement by conduct"); *Boehm*, 868 F.2d at 1185 (noting that the determination "requires consideration of the agreement between the parties"); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 808 (11th Cir. 1992) (same); 29 C.F.R. §785.17 (same). In *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347 (9th Cir. 1992), the court found there could be three different types of agreements relevant to the issue of whether on call time is compensable: "a collective bargaining agreement that provided overtime compensation for actual call-in work, but not for other off duty time"; a constructive agreement "by continuing to work" even though employees did not like the call in system; and acceptance of the terms of the on call policy by accepting employment after the policy was put into place. *Id.* at 355. Two of these agreements are present in this case.

Even if Beck did not like the on-call processes, by beginning to work under them and continuing to work under them and accepting paychecks, he constructively accepted the terms of the processes by his conduct. *Owens*, 971 F.2d at 355. *See also Taunton v. GenPak, LLC*, 762 F. Supp. 2d 1338, 1349 (M..D. Ala. 2010) ("Not only are the express terms of any actual on-call agreement important, but also significant is the parties' practical construction of that agreement, as exhibited by their conduct….Hence, agreements can be express or can be formed constructively when an employee is informed of an on-call policy and continues to work on-call assignments under the policy's terms."); *Bodie v. City of Columbia*, 934 F.2d 561, 564-65 (4th Cir. 1991) ("[C]ontinuance in the job and acceptance under the new plan of payment was sufficient to create a valid agreement, even though the agreement was implied and not in writing."); *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245, 1248 (5th Cir. 1986) ("Of course, it is clear that the employees did not like the no leave rule. But their dislike does not negate the existence of an agreement.  As the district court pointed out, continuance of employment can be evidence of an implied agreement to the terms of that employment."); *Ariens v. Olin Mathieson Chem. Corp.*, 382 F.2d 192, 197 (6th Cir. 1967) ("[W]e are of the opinion there was a meeting of minds resulting in a valid agreement that plaintiffs would not be paid for sleeping time.  The work schedule was explained in the pamphlet given to each man before he commenced work.  The men 'found out' about their work schedule on their first day of duty.  The work schedules were posted and plaintiffs continued throughout the time in question to accept paychecks which excluded sleeping time from hours worked. Certainly, this was sufficient to

constitute an implied agreement between the parties….");  *Braziel v. Tobosa Dev. Servs.*, 166 F.3d 1061, 1063 (10th Cir. 1999) (agreement existed where plaintiffs accepted their employment knowing that sleep time was exempted from paid work).

OGE's On-Call policy and practice does not provide for payment for on call time when not working.  In fact, it specifically states: "Members are not paid for being On-Call."  (McKinzie Decl. ¶ 36, Ex. 1-C at 13.)  Beck knew and understood this to by the policy when he began working in the Local Rep job in 1994.  (Stmt. of Fact ¶ 10.)  He constructively agreed by beginning his work under it, continuing to work under it, and accepting his paychecks knowing they would not be paid for the time they were on call but not working.

### D.   The services Beck provided while working were not related to what he did while On-Call.

An additional factor courts are to evaluate in determining whether on call time is compensable is "the relationship between the services rendered and the on call time." *Andrews*, 123 F.3d at 1330; *see also Skidmore*, 323 U.S. at 137. With respect to this factor, the Ninth Circuit in *Berry* stated that "the relevant inquiry is whether on-call waiting time is substantially similar to regular on-duty work."  *Berry*, 30 F.3d at 1184; *see also Townsend v. Mercy Hosp. of Pittsburgh*, 862 F.2d 1009, 1012 (3rd Cir. 1988) (comparing "the duties performed during the 'non-productive' periods on the on-call shift" to "the duties performed…during the regular shifts"); *Britt*, 2010 WL 4054383 at *7 (noting that "Plaintiffs were not required to perform any duties for [their employer] while on-call unless they were actually called-in").

Beck's on duty work include things like repairing and changing transformers, setting poles, stringing electrical wire, and other things related to providing, maintaining, and restoring electricity to customers.  Beck does not perform any of these duties when he is on call but not working.  Rather, while he is on call but not working he engages in a wide variety of personal activities, as discussed below.  (*See* Section IV.F. *infra*; Stmt. of Fact ¶ 16.)  Thus, there is no relationship between the services Beck performs for OGE and what he does during his waiting time.  Accordingly, under the undisputed facts of this case, what Beck does during his on-call waiting time is not at all related to his regular on duty work activities.  Thus, this factor, too, favors holding that Beck's on-call waiting time is not compensable.

### E.   Beck's alleged thirty-minute "response time" was imminently reasonable.

There is no bright-line rule regarding the length of time an employer may require an employee who is on-call to respond to work-related calls.  Case law teaches, however, that the fewer calls employees receive, the shorter the expected response time may be. *See e.g.*, *Dinges v. Sacred Heart St. Mary's Hosp., Inc.*, 164 F.3d 1056, 1057-58 (7th Cir. 1999) (finding seven-minute response time for EMTs insufficient to render on-call time compensable where plaintiffs only had a fifty-percent chance of receiving a call while on call); *Andrews*, 123 F.3d at 1329–30 (finding response time not particularly burdensome where EMT was required to respond to calls in a "reasonable" time, which he understood to mean between 5 and 10 minutes); *Bartholomew*, 5 F. Supp. 2d at 1166 (finding on-call time not compensable where police detectives were required to respond to call-outs "as

soon as possible" and there was no evidence that a particular response time was punitively enforced); *Burnison*, 820 F. Supp. at 554 (finding that five-minute response time "[did] not seem to be particularly onerous" for plaintiff-EMTs given low number of calls and small-town setting).  *But see Pabst*, 228 F.3d at 1134 (fifteen-minute response time); *Renfro*, 948 F.2d at 1537 (twenty-minute response time).   Moreover, if an employer has an expectation about response time, but does not enforce that expectation, a plaintiff-employee cannot credibly argue that his personal activities were restricted in any meaningful way.

This Court's decision in *Hudler* is particularly instructive here.  In that case, the court noted that the plaintiff's required response time—fifteen minutes to respond to the Call-Out and thirty minutes to be en route to the worksite—caused "less [intrusiveness] with [his] personal activities" than the response times caused the plaintiffs in *Pabst* and *Renfro*.  No. CIV-01-0343-HE, at 9.  The Court also found it significant in *Hudler* that plaintiff's failure to adhere to the required response time "did not trigger any disciplinary scheme other than the supervisor potentially having a discussion with [him] concerning the delayed response time."  *Id.*  Similarly, in *Price*, the court assumed for summary judgment that the employer's "required response time to be at least 30 minutes," but nevertheless held that the time these utility workers spent on-call was not compensable.  2016 WL 1558464, at *5.

Here, there is no genuine dispute that OGE's written policy required Beck to respond to Call-Outs in a "reasonable" amount of time.  Beck "believes" his supervisors required him to respond to Call-Outs within thirty minutes—meaning that he had to log

onto his MDU (which was portable) and "accept" the trouble ticket within 30 minutes. Compared to the other cases in this circuit, Beck's response-time requirement can hardly be called a "severely burdensome" restriction on the use of his On-Call time.  *See Burnison*, 820 F. Supp. at 555 ("[T]he overarching decision to be made is not whether there are disputed issues of material fact regarding the nature and extent of the restrictions applicable to each plaintiff, but rather whether the restrictions on the employees' on-call time are so severely burdensome as to render the on-call time predominately spent for the benefit of the [employer].").  This is especially so when considering Beck could travel by car to just about any location in his zone, even if he only drove at 50 miles per hour, and Beck did in fact engage in many personal activities both at home and elsewhere while On-Call.  (Stmt. of Fact ¶ 16; McKinzie Decl. ¶ 6, Ex. 1-A.)  Moreover, Beck was never formally disciplined, his pay was not docked, and his performance evaluations were not affected by his failure to adhere to it.  (Stmt. of Fact ¶¶ 18, 20; McKinzie Decl. ¶¶ 25, 34.)

Beck nevertheless claims that response times were measured using "CAIDI/SAIDI times" and that these times comprised a part of his annual bonus, called a TeamShare Bonus.  (Stmt. of Fact ¶¶ 20–22.)  He also claims that McKinzie "evaluated" his job performance based on his "CAIDI/SAIDI times."  (Stmt. of Fact ¶ 18.)  But these claims are red herrings.  *First*, even if everything Beck alleges regarding the "CAIDI/SAIDI time" requirement were true—which it is not—he was never subjected to a formal disciplinary action, docked pay, or punished in any way for failing to meet this requirement.  (Stmt. of Fact ¶¶ 18, 20; McKinzie Decl. ¶¶ 25, 34.)  Even when Beck did

not meet what he believed the "CADI/SADI time" expectation to be, he, like the plaintiff in *Hudler*, says he merely had a discussion with his supervisor about why it took him long to complete the call.  (Stmt. of Fact ¶ 20.)  *See also Hudler*, No. CIV-01-0343-HE, at 9.

*Second*, CAIDI and SAIDI are metrics that track the average number of minutes OGE's customers are without power during an electrical-service interruption or power outage company-wide and by district, regardless of whether the outage occurred during regular business hours or not.  (McKinzie Decl. ¶¶ 31–33.)  They cannot be, and have never been, tracked by individual Local Rep.  There is no CAIDI or SAIDI metric tied only to Beck.  (McKinzie Decl. ¶ 31.)

*Third*, Beck simply does not know how his TeamShare bonus was calculated.  But his individual response times have nothing to do with it.  (Stmt. of Fact ¶ 22.)  Rather, TeamShare is calculated based on company-wide performance in four broad categories. (*Id.*; Cantrell Decl. ¶ 4.)  The 12-month company-wide average for SAIDI makes up only a small portion of it.  (Cantrell Decl. ¶ 5.)  Accordingly, Beck's individual performance with respect to response time could not have measurably affected the amount of bonus he received.

### F.     Beck could use his On-Call time predominantly for his own purposes.

Courts in this circuit generally find that when employees are able to engage in personal activities while on call, even if subject to interruptions, this fact counsels against finding the on-call time compensable.  *See, e.g.*, *Price*, 2016 WL 1558464, at *2 (concluding that on-call time was not compensable, despite conflicting evidence in the

record, where "plaintiffs [were] able to engage in many personal pursuits while on call, although . . . there are some logistical difficulties that discourage, and may even prevent, some specific activities."); *Burnison*, 820 F. Supp. at 555 ("The law in this circuit is clear: the mere fact that the plaintiffs may not use their on-call time as they wish or that they may have to spend some time at home that they otherwise might spend elsewhere is not sufficient to make on call time compensable under the FLSA.").

In this case, Beck testified that while On-Call for OGE, but not actively working, he did yard work and cared for his home; visited with his children and grandchildren; traveled to Ardmore to visit his son or dine at a restaurant with his family; attended his granddaughter's tee-ball games in Marietta; watched television; worked on his personal vehicles, went camping, occasionally with Danny Jackson, at area lakes; slept; among other activities. Beck also had, and used, a significant amount of paid leave. Indeed, his timesheets show that he was on some form of paid leave for 29 weeks during the relevant time, or approximately 24% of the time.

On whole, the record conclusively demonstrates that Beck's On-Call time was not so constrained he could not engage in personal activities. That Beck may have missed certain family events, been Called-Out while in the middle of some activity, or even refrained altogether from engaging in activities, like attending church or the movies, does not change the analysis. Beck was substantially free to use his waiting time as he wished, provided he remained sober and available by phone to accept Call-Outs. This Court, other courts in this circuit, and the Tenth Circuit itself have repeatedly acknowledged that some restraint and interruption is expected in an on-call arrangement and does not make

the time compensable.  *See e.g., Andrews*, 123 F.3d at 1332; *Price*, 2016 WL 1558464, at *6; *Hudler*, No. CIV-01-0343-HE, at 9.

## V.    <u>Conclusion</u>

After retiring from his position and collecting handsome retirement benefits, Plaintiff Beck sued his former employer OGE seeking additional compensation for time he spent On-Call.  The FLSA requires employers to compensate employees for periods of idleness while on call only if they were "engaged to wait" or the employee's time was so severely burdened that he could not use it predominantly for his own purposes.  The undisputed facts in the record leave no doubt that Beck was not hired to wait, and he understood this arrangement throughout his twenty-year career as OGE's Local Rep for Marietta.  The record also reveals that Beck only received between 1.18 and 1.78 Call-Outs on average per week, and there is no genuine dispute about whether Beck was able to use his waiting time effectively for his personal pursuits.  As such, the substantive law of the FLSA and the Federal Rules of Civil Procedure dictate that OGE is entitled to summary judgment against Beck.

Dated:  August 1, 2016                Respectfully Submitted,

*/s/ Brian M. Jorgensen*
Brian M. Jorgensen *(Admitted Pro Hac Vice)*
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201-1515
214/969-3741; 214/969-5100 (FAX)
bmjorgensen@jonesday.com
*Attorneys for Defendant Oklahoma Gas & Electric*
*Company*

ROBERTA B. FIELDS, OBA #10805
KRISTIN M. SIMPSEN, OBA # 22302
MCAFEE & TAFT A PROFESSIONAL CORPORATION
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, Oklahoma  73102
405/235-9621; 405/235-0439 (FAX)
roberta.fields@mcafeetaft.com
kristin.simpsen@mcafeetaft.com

## CERTIFICATE OF SERVICE

I herby certify that on August 1, 2016, I electronically transmitted the foregoing document to the Clerk of Court using the ECF system for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Filing to the following ECF registrants:

Hilary S Allen, Esq.
DURBIN LARIMORE & BIALICK
920 N Harvey Ave
Oklahoma City, OK 73102-2610
405/235-9584; 405/235-0551 (FAX)
Email: hallen@dlb.net
*Attorneys for Plaintiffs*

*/s/ Brian M. Jorgensen*
BRIAN M. JORGENSEN

NAI-1501734700v3

31